IN

# THE SUPREME COURT

OF

# PENNSYLVANIA.

2 WS 327
210    ¹316

## Archer *against* Dunn.*

S. A. & W. E. and the firm of I. C. J. O. & Co., merchants, residing in Philadelphia, agreed with N. D. and with each other, to enter into the Chinese trade, for not less than three nor more than five years: the first named parties furnishing capital to send two ships annually to Canton *via* England; and N. D. giving his services in selling the goods at Canton and investing the proceeds in return cargoes, separately consigned to the parties in Philadelphia in proportion to their respective shares. N. D. was not to bear any part of the loss on dry goods, but was to share equally with the others the profits on their sales and to receive a commission on specie as well as other parts of each cargo. His profits and commissions were to be taken out at Canton and shipped on his separate account in one of the company's vessels; and the funds of the other parties were to be invested for each of them on separate account; and Chinese goods separately invoiced and consigned to them in proportion to their shares, without regard to the state of the partnership accounts. This arrangement continued during the contemplated period of five years, and was succeeded by another between N. D., on the one hand, who was to receive a commission on dry goods instead of profits, and the other parties, on the other hand, except W. E. who had retired. It was succeeded by another on the same terms, except that the concern guaranteed that the commissions should not fall short of $25,000 per year. *Held*, that a joint action for money had and received, to recover the proceeds of sales made in the second and third periods, might be maintained by S. A. & I. C. J. O. & Co. against N. D.

---

* This case was argued at March Term 1841.

(327)

[Archer v. Dunn.]

*Held* also, that N. D. could not set-off in such suit a debt due to him by S. A.

Where a contract for commissions to an agent abroad is uncertain in its terms, containing blanks to be filled by the other party, which never is done, the amount of charge for commissions must be collected from the letters and acts of the parties; and if the agent charges commissions in the accounts sent to his principals during several years, and is suffered to run through a succeeding contract without measures being taken to undeceive him until his return home, the interpretation of the contract, where it is doubtful, ought to be in his favour.

The amount of interest is to be determined by the law of the place where the contract is to be executed. It may be expressly reserved, though it exceed the rate allowed by the law of the domicil or the law of the forum; and where no rate is stipulated, the parties are presumed to have contracted with reference to the law of the place of performance, whether statutory or customary. If the contract is to be executed in China, the measure of damages for the breach of it is the customary rate of Chinese interest.

THIS was an action of *assumpsit* originally brought by Samuel Archer, Isaac C. Jones, Richard Oakford, and Samuel T. Jones against Nathan Dunn, in which the plaintiffs declared for a large sum of money had and received by the defendant to their use. After the institution of the suit Samuel Archer died, and the trial was had in the names of the survivors. The defendant pleaded *non assumpsit* and payment, and claimed a set-off of a sum of money due to him from Samuel Archer, and also for damages on account of the plaintiffs not complying with their contract to send two ships a year to Canton *via* Liverpool. The cause was tried at *Nisi Prius* before Mr Justice Rogers, and a verdict was rendered, by consent, for the plaintiff, subject to the opinion of the court, the amount due, if any, to be fixed by the court or the counsel. The defendant moved for a new trial.

The suit was brought to recover back moneys received by the defendant as the plaintiffs' agent or factor at Canton, in China. The defendant claimed to retain the moneys as his own property, in conformity with his accounts rendered to the plaintiffs. The plaintiffs objected to certain charges in these accounts as erroneous, alleging that the defendant was not entitled to withhold these sums of money, but was bound to pay them over. The claims consisted of three kinds: 1. An alleged overcharge by the defendant of the amount of commission he was entitled to for merchandise which left England for Canton, viz., the overcharge of 5 per cent. on gross sales, instead of $2\frac{1}{2}$ on gross sales and $2\frac{1}{2}$ on nett proceeds. 2. The retention of a large sum of money as commissions on the ship Isabella on her 4th voyage to Canton; which the plaintiffs alleged was to be placed in the second period, viz., from the 13th of July 1828, and terminating on the 13th of July 1830; and the defendant contended that it came under the arrangement from 1826 to 1828. 3. A claim of interest at 12 per cent. on the sums retained by defendant.

The evidence was voluminous, consisting of the agreements of the parties, their correspondence during many years, and the ac-

[Archer v. Dunn.]

counts between them, with arguments and discussions on the subjects in controversy prior to the institution of this suit.

It appeared that the plaintiffs were merchants residing in Philadelphia, and projected a course of trade on a large scale from Philadelphia to Canton, for which purpose they employed the defendant to go to Canton and reside there. The contracts between the parties underwent several changes from time to time. The first agreement was entered into on the 12th of July 1821, (in connection with Whitton Evans, who withdrew in 1826), and was for a residence there by the defendant for not less than three nor more than five years; and under it he remained five years: and the defendant was to be compensated partly by a commission and partly by one-quarter of the profits. The second agreement was for a continuance of two years further from the 13th of July 1826, and the compensation to be by a charge of commissions. A third agreement was made for his residing there two years from the 13th of July 1828, to end on the same day in 1830; the commissions the same, but $25,000 per annum was guaranteed. The defendant went to Canton, and continued there the whole time agreed on, and returned to this country on the 22d of November 1831. The dispute turned on the second and third agreements, the first being used only for illustration.

During the time agreed on, from 1826 to 1828, the plaintiffs despatched the following ships from Philadelphia to Canton *via* England:—The Isabella (third voyage) arrived in Canton on the 5th of February 1827. The Woodrop-Sims, on the 7th of November 1827; the Globe, on the 28th of February 1828; and the Isabella (fourth voyage) on the 13th of October 1828. This last vessel sailed from Liverpool on the 15th of May 1828. If she fell within the contract from '28 to '30, the commissions on her and the Tobacco Plant exceeded $50,000, the sum stipulated by the agreement. If she belonged to the second period, the commissions of this year were deficient by nineteen or twenty thousand dollars.

Most of the foregoing vessels, as well as several others, went from Philadelphia to Canton *via* Liverpool. There were some others sent direct from Philadelphia to Canton, about which there was no dispute, namely, the Newport and the Tobacco Plant. There arrived in China to defendant, on consignments by plaintiffs, during the four years from the 13th of July 1826, to the 13th of July 1830, as follows, viz.:

Ship Tobacco Plant, (fourth voyage), 17th of October 1826, from Philadelphia.

Ship Isabella, (third voyage), 5th of February 1827, from Liverpool.

Ship Newport, 12th of August 1827, from Philadelphia.

Ship Woodrop-Sims, 5th of October 1827, from Liverpool.

Ship Globe, 28th of February 1828, from do.

II.—42　　　　2 c *

[Archer v. Dunn.]

Ship Isabella, (fourth voyage), 13th of September 1828, from Liverpool.

Ship Tobacco Plant, (fifth voyage), 13th of August 1829, from Liverpool.

Ship Isabella, (fifth voyage), 23d of December 1829, from Liverpool.

The defendant made out accounts current, from time to time, separately, with S. Archer, and with Jones, Oakford & Co., in which expenses, charges, &c., on all goods purchased for homeward shipment, as well as on outward cargoes, were charged equally, one-half to S. Archer and the other half to I. C. Jones, Oakford & Co. The account-sales were all headed sales by N. D. of cargo received per ship ———, for account of Samuel Archer and I. C. Jones, Oakford & Co., of Philadelphia.

The following agreements and correspondence were read in evidence on the trial:

1821, July 12. Agreement between Samuel Archer, I. C. Jones, Oakford & Co., and Whitton Evans of the one part, and Nathan Dunn of the other part.

The first named parties having determined to enter into the China trade on joint account, and to make the same their principal business, mutually bind themselves to continue the same for a term not short of three, nor exceeding five years, unless it should be found that the business cannot be continued (during either of those periods) without a loss, in which case, a majority in the United States may annul the same at an earlier time.

The first named parties engage to furnish the whole capital to carry on said trade, and to send not less than two ships in each year to Canton, *via* England.

Nathan Dunn agrees to proceed to England to procure a cargo of dry goods, to be shipped on board the ship Columbian, with what specie the first named parties may ship, and proceed to Canton.

With a view of embracing all the advantages of the China trade, N. Dunn agrees to reside in Canton during the period this arrangement may continue, and to transact all the business of said concern.

The first named parties agree to allow Nathan Dunn three per cent. commission on all the specie shipped, and one-fourth of the profits arising on the sale of dry goods to be received in Canton on closing the sales of each shipment, and three per cent. on sales, and three per cent. investment of proceeds of all other cargo (than dry goods), by the concern: but no commission for investing the proceeds of dry goods.

The first named parties mutually agree that should there be a loss on any cargo of dry goods sent by the concern to Canton, that Nathan Dunn is to bear no part thereof.

[Archer v. Dunn.]

The first named parties mutually agree, that in placing funds in England, each one is at liberty at their own risk, to make remittances or shipments in any way they may deem most to their interest, for their respective proportion.

The first named parties are each to receive one-fourth of the profits arising out of the sale of dry goods, and each one-third of the profits on the sale of other cargo.

All the funds invested at Canton on account of the three first named parties to be in separate invoices, consigned to them separately, each containing as near the same kind of goods as possible, and occupying nearly the same tonnage.

Nathan Dunn is to ship his proportion of the profits arising out of the sale of dry goods, in nearly the same description of goods, and occupying nearly the same proportion, of room, as the first named parties, in the first vessel belonging to, or chartered by the concern after the sales of the cargo are closed in Canton; the freight on his tonnage to be at the same price as the concern's.

It is agreed that in estimating the cost of dry goods in Canton, that the exchange on England shall be taken at par, and all that the sales produce above this estimation shall be divided as above specified; subject, however, in the United States, to the charge of the current rate of exchange, or price of bills at the time of remittance to England for the payment of the same, with commission, insurance, and interest, until in funds for the same in Canton.

If the above charges should exceed the par of exchange, N. Dunn's agent is to pay his proportion to the first named parties in Philadelphia. Should they be under the par of exchange, the first named parties to pay N. Dunn's agent his proportion.

The first named parties agree to allow N. Dunn, in lieu of rent of factory, provisions, servants, cumshaws to linguist and house compradore, if two ships arrive within each year, $1667 on each ship; if three or more within the year, $550 to be charged on such additional ship, to be received in Canton, and three per cent. to be charged on the ship and factory disbursements: Nathan Dunn to be allowed 15 tons privilege each, on two ships annually. If but one ship arrives at Canton within the year, N. Dunn is to receive $3334 on said ship for factory disbursements, or expenses in Canton; and if none should arrive within the year, the first named parties agree to pay N. Dunn $3334 in lieu thereof.

Any storage, or other expenses occasioned by purchasing goods in anticipation of arrivals, to be charged to the concern.

The first named parties agree, that in case they should discontinue the concern at an earlier period than is now contemplated, they will allow N. Dunn at the rate of $3334 per annum, during the time he may be employed at Canton in closing the concern after the dissolution, not to exceed one year.

[Archer v. Dunn.]

N. Dunn agrees that his agent shall pay to the first named parties, the nett proceeds arising out of his proportion of profits on dry goods sold in Canton, on closing the sales of each shipment in Philadelphia.

The first named parties engage to pay N. Dunn an interest of six per cent. per annum on all sums received from his agent, which is to be employed on their account and risk in the contemplated business during the continuation of said concern; at the expiration of which, the first named parties individually bind themselves to pay the principal thus received, with interest, unto Nathan Dunn, in cash or their obligation at sixty days, with interest.

It is agreed that Nathan Dunn is at liberty to employ any funds that may arise from commissions in any way he may deem most to his interest.

It is agreed that any specie or stores for his own use, that N. Dunn may have to ship to Canton, shall go free of freight.

Nathan Dunn engages to use his best endeavours in the sale of the outward cargoes, and the purchase of the return cargoes, for the interest of the concern.

Nathan Dunn may deduct the excess of his actual expenses (over and above what is allowed him) from his share of profits on the dry goods in Canton, and what may be required for his stores in Philadelphia, to be deducted from the proceeds arising from the sales of said dry goods.

N. Dunn agrees to give some one of the concern the preference in consigning the merchandize arising out of the profits of the dry goods in Canton, provided they will transact the business on as satisfactory terms as any other person.

It is understood that N. Dunn is not to solicit or receive consignments from any other concern whatever.

It being also expressly understood that this is to be the business of the concern, each party bind themselves, in order to carry the above agreement availably into effect, not to engage in any other business that will interfere with this arrangement, and particularly not to encourage or engage in other shipments beyond the Cape of Good Hope. (Signed respectively.)

*Philadelphia, 7th mo. 12th,* 1821.

P. S. It is understood by the parties to the within agreement, that N. Dunn's privilege for stores, specie, or goods, may be 35 tons each in two ships outward, annually, and is not to exceed this specification. (Signed respectively.)

———

"*Canton, March* 11th, 1824.

"S. ARCHER, I. C. JONES, OAKFORD & Co., } and WHITTON EVANS. }

" Respected friends,—If the East India Co. do not increase their importations, and the quantity of dry goods sent to this

[Archer v. Dunn.]

country by Americans should be small,—or say that it does not exceed the quantity heretofore sent,—I am of the opinion that there would not be much risk of a loss in forwarding two ships with cargoes to this country annually, consisting each, say of from $250,000 to $300,000, provided they arrive in the proper season. As respects your proceedings on the receipt of this, if you have not forwarded more than one cargo since the Columbian, Faulks, and say this comes to hand about the 30th July, 140 days, and that Samuel could arrive in England by the 1st September, that a cargo could be despatched by the 15th December, allowing him $3\frac{1}{2}$ months, and allowing a ship 130 days' passage, she would arrive here say the 1st of May. I suggest for your consideration, whether it might not be better, under present circumstances, to send a second ship, although too late to sell the cargo to best advantage, in preference to laying over for the next season. If you should decide in the affirmative, it might be best, on account of the lateness in the season, to let the amount be small, say $150,000 to $200,000.

From the time required to effect sales in this country, I should not wish a cargo to exceed $300,000, and not more than two in a season. In Nos. 19 and 45, I have informed you that it is very important that the cargoes arrive here at the time specified,—to which I now wish again to call your attention, and to request that in future they may be forwarded so as to arrive here one month earlier than the time specified in No. 19,—say the first, from the first of the 11th to the last of the 12th month; and the second, from the first of the 2d month to the last of the 3d month.

" Truly,

" NATHAN DUNN."

" *Canton, December 7th* 1824.

" SAMUEL ARCHER.

" Dear friend,—There would, in my opinion, be considerable risk in consigning goods to much amount to any of the Hong merchants of this place. They should not only be under the direction of a person acquainted with the business of this country generally, but with the quality and value of dry goods in particular; and even then, to pursue it to any extent with a prospect of success, it will require the strictest personal superintendence.

I have not made any discoveries in any new branch that I have sufficient confidence in to recommend to thy notice. The most profitable trade to this country is, I presume, the one in which thou art engaged.

The competition in the general commerce between this and the United States, is now so great that it cannot be continued in the usual way with much prospect of success. The most lucrative mode that has heretofore been pursued, and which might yet, if judiciously managed, yield a moderate profit, is simi-

lar to what I took the liberty of pointing out to you under date of the 11th mo. 17th, 1823—No. 60.

In adverting to the query contained in thy favour of the 5th mo. 29th, and the period when the present agreement with the concern terminates, I have thought that it might now be seasonable, and that thee might expect that I should inform thee whether or not there was any advantageous business that I could recommend to thy notice for our mutual benefit, that might be taken up at the expiration of that period. I am aware that propositions should be made with caution by junior persons in subordinate situations, but as I am addressing one who I hold in higher estimation than those of my friends in the ordinary course of business, one who, though he might reject my opinions, will not treat them with ridicule; these, when taken in connexion with the time required for replies to our communications, may be some apology for the proposition that I am about to make. But previous to proposing it, I cannot refrain from stating, that I have been looking forward to the day of returning to my dear native country with much solicitude, and if a moderate compensation for my personal wants were all that was required, I might look forward to the end of the present agreement with a hope of its being realized; but as there may be others that may suppose they are entitled to my assistance, I cannot determine on that period for my return, without an apprehension that it may at least be premature. For all the privations that I am sustaining, a palliation is easily found in the magnitude of my former misfortunes.

If, then, thee should be of the opinion that the present business might be continued for a further term than the present agreement to advantage, either by the same concern, or on thy own account, I would consent, if agreeable to you, to remain for a further term of two years, to commence, say on the 7th mo. 13th 1826, and end on the same day in 1828, on the following conditions:

That you should send two ships to this country by way of England, with about $300,000 cost in dry goods, and from 50 to $80,000 in specie, in each ship annually, consigned to my address; that if more than two ships were annually sent by the way of England, or specie, or other property, is sent to this country by any of the concern from any other quarter, or in ships direct from the United States, that all such property should be consigned to myself.

That I should give my exclusive services to the concern, and receive as a compensation for the same, 3 per cent. commissions on the gross amount sales, and 3 per cent. for investing the proceeds, and 3 per cent. on the amount of specie shipped. The charges on the ships, &c., and my privileges in them to be the same as heretofore; and that I should be at liberty to manage my funds in any way that I might deem most to my interest, except-

[*Archer v. Dunn.*]

ing that I should not interfere with your interest in importing any dry goods from England.

I should here observe, that, if at any time the information you should receive from me of dry goods should be so unfavourable as to make it necessary for you to suspend your operations for a season to prevent a loss, that in that event, I should not wish a fulfilment of your stipulation in sending the two ships in each season. If no ship should arrive within the year, that I should be allowed 3,334 dollars in lieu of factory expenses.

As I am not to receive consignments from any other concern, it will be required that you engage that this shall only be yours, and that you will not enter into any other that will in the least interfere with this arrangement, and particularly not to engage in, or encourage any shipments to the eastward of the Cape of Good Hope.

Having now made a tender of my services, I have to request that thou wilt, as early as thee can after the receipt of this, inform me of thy determination.

If you should determine on a further continuance of the business, it would be desirable, if practicable, that the same agent be continued in England for purchasing the goods, and that the same attention be paid as heretofore to any alterations that the state of this market may hereafter require in purchasing the different articles: and that the time and mode of disposing of the merchandise in this country, be left to my direction to manage in the best way I could for your interest.

Accept my best wishes,

1st Phœnix. ⎱
2d Caledonia. ⎰　　　　　　　　　　　NATHAN DUNN."

---

" *Philadelphia, April* 15*th*, 1825.

" NATHAN DUNN.

Esteemed friend,—The Tobacco Plant left this the 7th inst., and hope this will find her safe at Canton.

We now come to answer thy proposition with respect to remaining in Canton for two years beyond the term formerly agreed upon. The concern are agreed to continue the business for a further term of two years, from the 7th mo. 13th, 1826, on the same terms as formerly. If this is not agreeable to N. D., will allow 5 per cent. commission on sales of merchandise, and for investing nett proceeds of same, and 3 per cent. for specie, and will engage to send at least two ships in each year with merchandise and specie (if advice received from thee will warrant it without a prospect of loss), to an amount not less than $300,000, each ship; $260,000 of which shall be in merchandise; and, as said above, if the advices received from thee from time to time will warrant a further amount being sent, it shall be done; and any other business done by the concern at Canton during said period,

[Archer v. Dunn.]

will be given to thee at the customary commission. We would prefer thy accepting the first of the two propositions now offered, but if the second be preferred, shall be satisfied. We do not know how thee may consider the last offer on our part, but we think it liberal, as all the risk of market, bad debts, &c., &c., will rest with us. We shall be glad to know, as early as is convenient, whether either of the terms proposed meets thy approval; in the mean time shall continue our operations as though no change was to take place in thy remaining in Canton.

With sentiments of much regard, we are thy friends,
(Signed)        " I. C. Jones, Oakford & Co.
                     " Samuel Archer,
                     " Whitton Evans."

---

*Extract of letter to Nathan Dunn, from Samuel Archer, dated Philadelphia, April 18th, 1825.*

" The concern have written to thee by this conveyance respecting thy remaining in Canton two years beyond the time formerly agreed upon. Thee will of course decide as may best suit thy own views upon this subject; but if I was *entirely disinterested* I should say, judging from past operations, that either offer was advantageous, but the latter of course *most certain*, say four voyages during the two years, $250,000 each, in dry goods, is $1,000,000. Sells for $1,400,000, at 5 per cent., is $70,000; and say $160,000 in specie, at 3 per cent., is $4,800; total commissions $74,800; on the returns 25 per cent. would make a *pretty good business* for *two years*, with the chance of *still larger* funds, should the prospects warrant, and possibly one or two *ships direct* to thy consignment."

---

*Extract of Letter No.* 108, *dated Canton, July* 18th, 1825, *from Nathan Dunn to S. Archer, I. C. Jones, Oakford & Co., and Whitton Evans.*

" Had your ship arrived by about the 1st of the 4th month, and her size moderate, it was my intention to have endeavoured to effect sales sufficient for her sailing with light funds in all the 7th or 8th month, but the unseasonable amount and large tonnage of the New Jersey, has laid such an effort at rest.

My situation at present is an anxious one. The contracts for silks amount to $140,000, and for teas bought to $40,000; the money for most will soon be required. To sell the ship's inward cargo, in the present state of the market, will require a sacrifice of 40 a $50,000; to hypothecate will be nearly as injurious; to hold until the proper season, to wit, the 11th month, will put the persons to whom I owe the money to serious inconvenience.

In looking to sales, the previous loss is not the most serious objection to its accomplishment. If you will allow me to digress,

[Archer v. Dunn.]

I shall endeavour to give my reasons; the conduct of all the few foreigners that reside in this country (particularly the Americans) is closely scrutinized by the Chinese; we all have our particular characters amongst them. They have strong prejudices, and transact business very different from the Americans or English merchants; one particular trait in their character is the facility with which they unite, when they find a man's necessities occasionally require him to sell, to purchase the goods at a rate much below the market value. These combinations, or consues as they are termed, will account for the difficulty (you will perceive that I allude to the cloth, and other outside merchants) of a poor hong merchant's accomplishing favourable sales to any extent, unless it is a mere agent or broker; whenever they ascertain that a poor hong has actually made purchases, they withdraw until his necessities compel him to sell on any terms."

Received 12th mo. 24th, 1825.

---

*Extract of Letter, dated Philadelphia, September* 27, 1825, *from I. C. Jones, Oakford & Co., and Whitton Evans, to Nathan Dunn.*

" Our last was under date of 14th inst., (to be forwarded by this conveyance), since which our markets have experienced a further depression for almost every description of goods that are offered at public sales; and Canton goods, both teas and silks, feel their full share, the market already being pretty well supplied, and parcels being constantly thrown into auction appears to have completely alarmed the buyers. Crape dresses that were in fair request at $5.50 at the time the Isabella arrived, have recently been sold at $4.75 to $5.00; black handkerchiefs $6.75 to $7.00; and other articles also at considerably lower prices. We made pretty large sales before the fall, most of which has been since the arrival of the Pacific."

---

*" Canton, November* 19th, 1825.

Samuel Archer, I. C. Jones, Oakford & Co., ⎫
    and Whitton Evans.                     ⎭

" Respected friends,—Had I been aware that the terms upon which I offered to remain in this country, as stated to your Samuel Archer, under date of the 12th mo. 7th, 1824, would be considered by you unreasonable, it might not have been foreign to the subject to have informed, that in making the proposition I was not actuated entirely by sinister motives, or they might have led me to look for a higher compensation from another quarter; but I really believed that the offer (as far as interested motives would permit me to judge at least) was, under all circumstances, reasonable. Had it been a business such as is usually pursued by the Americans in their intercourse with this country, my claims

II.—43            2 D

[Archer v. Dunn.]

for a compensation in its execution would have been of a much less prominent nature; but as it is one which I have introduced to your notice, and one in which I have suffered some anxiety and privation in fulfilling the department allotted me in this country, the success of which I am confident would yet be found on a trial to be very materially connected with its judicious execution in this country, and one which, under the most favourable circumstances, would be most materially affected by an experienced competitor. These were some of the considerations which led me to believe that you would not consider the terms I proposed unreasonable.

The preference I feel for those who have countenanced me with their confidence and efficient support, has been the strongest motive in influencing me to the determination of remaining for a further term of two years in this country as your agent; and I now inclose two copies of a memorandum of an agreement drawn up in conformity with the conditions stated to your Samuel Archer in the 12th mo. 7th last, excepting the commissions on the sales and investment of the dry goods, which, after the foregoing remarks, I must leave for your decision to fill at either the five per cent. for the sales and investment of dry goods, agreeable to your offer under date of the 4th mo. 15, 1825; or say two and a half per cent. on sales of dry goods, and two and a half per cent. for investing the proceeds, which amounts to the same; or on my terms of three per cent. on the gross amount sales of dry goods, and three per cent. for investing the nett proceeds.

I should here state my reasons for inserting gross amount sales on the dry goods. In several instances I have succeeded in making arrangements with some of the poorer hong merchants for the payment of the duties at a handsome discount, as you will see by referring to the sales, the details of which I need not recapitulate; suffice to say, that in its execution I have had considerable trouble, and have been strongly opposed by the richer part of the co-hong, aided by the Hon. the East India Company: for these and many other reasons, there is no part of the business on which I feel that I have stronger claims for a compensation.

Although I must now accept of either commission on the sales and investment on the dry goods, I shall wait with some solicitude your determination.

You will have the goodness to return me one of the copies by the first opportunity.

Of my attention to the business intrusted to my care, and the manner of its execution, you have, no doubt ere this, formed a judgment; whether it has been such as to have met with your approbation I am not now about to inquire, but to say that in coming to the decision of remaining for the further term of two years, that I am not insensible to the stimulus inseparable from the approbation of those whom I wish to please; and a belief that my

exertions will be well received, will continue to excite an increased zeal in the gratifying task of giving satisfaction to my employers. With much respect, I remain,

1st per Addison.　　　　　　　　　　　　　　NATHAN DUNN."

―――――

"Samuel Archer, I. C. Jones, Oakford & Co. and Whitton Evans, merchants of Philadelphia, having been engaged in the China trade for several years past, under a written agreement which expires on the 7th mo. 13th, 1826, believing it would be to their interest to extend the business for a further period, and Nathan Dunn who has resided at Canton as their agent agreeing to remain in China for that purpose, the first named parties engage to continue the China trade on joint account for a further term of two years, commencing on the 7th mo. 13th, 1826, and ending on the same day in the year 1828, and to employ Nathan Dunn to reside at Canton as their sole agent, on the following conditions:

The first named parties engage to send not less than two ships in each year to Canton via England, with cargoes of not less than $300,000, or say $260,000, first cost in dry goods, and $40,000 in specie, in each ship consigned to Nathan Dunn.

The first named parties engage that if more than two ships are sent *via* England to Canton in each year, or that if ships, specie, or any other property is sent to Canton by the concern, or any one of the same, from any other quarter, or in ships direct from the United States, that all such property shall be consigned to Nathan Dunn.

Nathan Dunn engages to use his best exertions in disposing of the outward cargoes received from the first named parties, and in investing the proceeds for the return cargoes for their interest.

Nathan Dunn engages that all the funds invested at Canton for the three first named parties, shall be in three separate invoices, consigned to each respectively, corresponding in amount and kind of goods as near as possible, and occupying nearly the same tonnage.

Nathan Dunn is not to interfere with the interest of the first named parties in soliciting or receiving consignments from any other concern, (excepting a mutual arrangement with some respectable resident at Canton to act in case of demise), or in importing dry goods from England.

The first named parties engage to allow Nathan Dunn, as a compensation for his services, the following commissions, to wit:

　　per cent. on the　　　　amount sales of dry goods, and per cent. for investing the proceeds, and three per cent. on all specie shipped, and three per cent. on sales, and three per cent. for the investment of all other cargo (than dry goods), and three per cent. on the ships and factory disbursements to be received in Canton.

The first named parties agree to allow Nathan Dunn, in lieu of

[Archer v. Dunn.]

factory rent, provisions, servants, cumshaws to linguist, and house compradore, if two ships arrive within each year, sixteen hundred and sixty-seven dollars on each ship; if three or more within the year, five hundred and fifty dollars to be charged on each such additional ships; if but one ship arrives at Canton within the year, thirty-three hundred and thirty-four dollars is to be charged in lieu of factory rent, &c., as above specified, on said ship; and if none should arrive within the year, then the first named parties agree to pay to Nathan Dunn thirty-three hundred and thirty-four dollars in Canton in lieu thereof.

The first named parties agree to allow Nathan Dunn fifteen tons of forty cubic feet privilege each in two ships, in each year from Canton to the United States; and for stores, specie, and merchandise, (other than dry goods), not exceeding thirty-five tons each in two ships annually from the United States *via* England to Canton, free of freight.

Any storage or other expenses on the outward cargoes at Canton, or on goods purchased in anticipation of arrivals, to be charged to the first named parties.

Nathan Dunn is at liberty to transact business on his own account in any way that he may deem most to his interest.

It is understood that if the information received from Nathan Dunn, by the first named parties, of the state of the Canton market for dry goods should be so unfavourable as to make it necessary for them to suspend their operations for a season to prevent a loss, that in such an event their engagement to send two ships in each year *via* England to Canton, is not to be considered binding.

It being expressly understood that this is to be the business of the concern, the first named parties engage that they will not enter into any other business that will in the least interfere with this arrangement; and particularly not engage in, or encourage any other shipments to the eastward of the Cape of Good Hope.

Signed at Canton, 11th mo. 19th, 1825, by

NATHAN DUNN.

P. S. On signing the above agreement by N. Dunn, the first item of commissions on the sales of dry goods and investing the proceeds is left blank. N. Dunn asked three per cent. on the gross amount sales, and three per cent. for investing the proceeds as per letter to Samuel Archer of the 12th mo. 7th, 1824, and the first named parties offered five per cent. on the sales and investing the nett proceeds, as per their favour of the 4th mo. 15th, 1825. It is now left with them to fill up, at not under the five per cent., or above three per cent. on the gross amount sales, and three per cent. for investing the proceeds, as they may think proper.

NATHAN DUNN."

[Archer v. Dunn.]

"*Canton, December* 7*th,* 1825.

" SAMUEL ARCHER, I. C. JONES, OAKFORD & Co. {
      and W. EVANS.

Respected friends,—Under this date I have written to Samuel
T. Jones, inclosing an estimate of the quantity of the different
articles of dry goods that I wish hereafter forwarded in each ship,
amounting to about $310,000, estimating exchange between the
United States and England at par, and taking them at the same
cost as those by the ship New Jersey. Of the quantity and
amount contained in that estimate, I am now of the opinion it
will be pretty safe to forward two cargoes in each season to this
country, unless the shipments by the Americans, or the E. I. C.,
is more than usual, of which Samuel can ascertain in England,
or an unusual depression in this market, of which I will give the
earliest information.

Although I have frequently urged the importance of your ships
arriving at this market at a favourable season, the losses that you
have sustained in consequence of several arrivals at an unfavour-
able season, and its importance, is, I trust, a sufficient apology for
my again calling your attention to this subject. Under date of
the 3d mo. 11th, 1824, I requested that the first ship in the season
should arrive here from the 1st of the 11th mo. to the last of the
12th mo.; and the second ship, from the 1st of the 2d mo. to the
last of the 3d mo. As a fair average passage for ships sailing
from England at those seasons is five months, I have now to
request that the first ship in each season should sail from Liverpool
not later than the 10th of the 6th mo., and the second ship not
later than the 10th of the 9th mo.

If you cannot make up your minds in time for Samuel to des-
patch the ships by those periods, it would be much to your inte-
rest to defer shipment until the regular season of the next year,
in preference to their laying over in this port.

Very sincerely,  NATHAN DUNN."

1st per America. {
2d per New Jersey. {

___

*Extract of letter to Nathan Dunn, from I. C. Jones, Oakford &
Co., and Samuel Archer, dated Philadelphia, February* 1*st,* 1826.

"It is our wish that all the business be closed at Canton, includ-
ing the Phœnix cargo, which is now considered the last vessel to
Canton under our *original agreement;* and should any further
business be done to Canton during thy stay there, it will of course
be on a new account, and the sooner the old one can be closed the
better, so that we can ascertain what the result is, and have but
little doubt it will prove satisfactory to all concerned. Please,
when rendering a final account, to furnish one for each *shipment;*
should any goods remain unsold on receipt of this, perhaps it may

[Archer v. Dunn.]

be as well to close them, even at some little sacrifice, in order to close the concern sooner."

---

*Extract of letter dated Philadelphia, April 7, 1826, from I. C. Jones, Oakford & Co., Samuel Archer, and Whitton Evans, to Samuel T. Jones.*

"We have been waiting for the arrival of the ship New Jersey to bring us advices from Nathan Dunn, that should govern as to our future movements in the Canton trade. On the 5th inst., we received by the America, arrived at New York, the letter of which the inclosed is a copy, and on the strength of his recommendation have concluded to send one ship from Liverpool to Canton the approaching season, (there would not be time for two, if we wished it.) We therefore have to request thou wilt immediately on the receipt of this, make arrangements for the purchase of a cargo of dry goods on our account, to the amount of £60,000 sterling, to be assorted as near as practicable to the list furnished by him; and as goods have fallen in price so much, we presume this sum will buy nearly as many goods as $310,000 would at the old prices; should any of the staple articles have fallen much more in proportion than others, it may be well to increase or diminish accordingly to some extent, but not so as materially to change the assortment."

---

*Extract of letter No. 133, dated Canton, April 14, 1826, from Nathan Dunn to Samuel Archer, I. C. Jones, Oakford & Co., and W. Evans.*

"Since the sailing of the Phœnix, I have not effected any further sales or made any purchases. I am very anxious to dispose of the heavy stock of cotton goods on hand. And although it is now the proper season for selling, there does not appear to be the least demand, and I dare not enter into further engagements, in my present situation."

Received 9th mo. 9, 1826.

---

"*Philadelphia, April 15, 1826.*

"Esteemed friend, Nathan Dunn,—

We write this without much prospect of its early delivery, and may advise of the safe arrival of the ships Tobacco Plant and New Jersey, the former the 10th ulto. and the latter on the 13th inst., but we regret to say to a very bad market, particularly for teas, on which there will be a heavy loss. The silks per T. Plant will pay some profit, and nankeens are scarce and pay pretty well. In consequence of the information received from thee, particularly that contained in No. 107, added to the bad state of the market here, we did not think it safe to send a cargo of dry goods until we received further advices from thee; but upon receiving thine

[Archer v. Dunn.]

of 12th mo. 7, 1825, No. 117, on the 5th inst., we immediately wrote to S. T. Jones (by the packet of 8th inst.) to prepare a cargo of the amount of £60,000 sterling. This sum we presume, at the present very reduced rate of goods in England, will buy as many as $310,000 would have done a year ago. We request him to have them ready for shipment in the 8th month; and as the season is so far advanced, shall send but one this year by way of England, which is agreeably to thy instructions, but have pretty much concluded to send the T. Plant direct, about the middle of next month, with $100,000 in bills on London, drawn by the Bank United States, and $100,000 in Spanish dollars. We presume thee will have heard ere this of the total loss of the Juniatta (our ship that left Liverpool for Canton in the 11th mo. last) on the coast of Ireland. Should thee have prepared any cargo in advance for her, thee will keep it for the T. Plant. Thee has no doubt also heard of the failure of E. Thomson and others, also the temporary stoppage of J. & W. Lippincott & Co.

For the concern,<br>I. C. Jones, Oakford & Co."

---

*Extract of letter to Nathan Dunn from Samuel Archer and I. C. Jones, Oakford & Co., dated Philadelphia, May 20th 1826.*

"We have already adverted to W. Evans having withdrawn from the concern, and the state of things here is such as to make us hesitate for the present as to what course we should pursue relative to next year's business, under the articles of agreement sent out by thee; but we concluded that at all events the sending of these ships (the Tobacco Plant and Isabella) would compensate for remaining this year, and by the New Jersey we shall have time to write thee fully on that subject."

---

*Extract of letter, dated Philadelphia, June 16th, 1826, from Samuel Archer and I. C. Jones, Oakford & Co., to Nathan Dunn.*

"Since ours of 5th mo. 20th, by the Tobacco Plant and Caledonia, we have received thy favours, Nos. 126 and 127, per Beaver, and note the list of goods bought and contracted for, for the Phœnix. The dry goods, we think, will about pay cost and charges, but on the teas, as usual, this year there will be a heavy loss. The prices continue, as thee will see by the price current, without much variation, although there is not quite so many forcing at auction as a few months back; and if Thomson's cargoes were out of the market, there would be some chance for improvement, but they will be likely to keep down prices all the season.

T. H. Smith has got off two ships, and says he means to send three more, (it is said he has borrowed largely on respondentia at

[Archer v. Dunn.]

14 per cent.) Hone has had the control of most of his cargoes that arrived this season, and has mostly forced them off at very low prices."

---

*Extract of letter, dated Philadelphia, July 17th 1826, from I. C. Jones, Oakford & Co., and Samuel Archer, to Nathan Dunn.*

" There is very little change in our market here since we last wrote, indeed it has been a remarkably dull season for business; every description of merchandise has depreciated very much, Canton goods having come in for their full share of the fall, particularly teas.

Thee will see noted in the price current sent, all the sales of any consequence. The failures that have taken place have in a very great degree destroyed confidence, so that not only our monied men, but, to a very considerable extent, our banks and insurance offices, are lending their money on public stocks in preference to discounting notes and loaning on respondentia, although in the former case they get but $4\frac{1}{2}$ to 5 per cent. The consequence is, that we have been obliged to hold a large part of our importations, and whether they will do much better in the fall remains to be seen."

---

" *Philadelphia, July 18th 1826.*
" Esteemed friend, Nathan Dunn,

We have already written thee by this conveyance to which we refer. In our letter of 5th mo. 20th, we advert to the difficulty we felt in coming to a decision as to any further operations to Canton after this year. Since that time we have reflected seriously upon the subject, and have pretty much come to the conclusion that it will be best to close our present operations with the voyage about commencing in the Isabella. And that, as soon as that cargo can be satisfactorily disposed of, together with any goods that may remain of former parcels, we will leave thee at liberty to settle up the concern and pay us a visit, when, if anything satisfactory should open for our mutual advantage, we may embrace it and commence anew. Whether thee will be able to come home in the Isabella, thee will be best able to judge; we think it doubtful. We would also recommend thy keeping this determination from the knowledge of the Chinese, as they might take advantage of it, and hold back from buying in hopes of thy being forced to sell low to close sales. In coming to this determination, there are several things that have weighed with us: and first, the rate of exchange, which has constantly been so heavy against us, with interest and insurance on that additional sum, has all along made heavy inroads on our profits; the length of time that it has been found necessary to keep on hand a large portion of the goods in Canton to enable thee to get fair prices making a long interest account, and

[Archer v. Dunn.]

the dull and frequently losing state of the market on this side for returns, added to the risk of bad debts, making it necessary to have such a large amount of funds employed, that whenever there is a scarcity in the money market we are liable to be subjected to inconvenience from the fear or caprice of bank directors; and what is the most unpleasant of all, from the time of our first commencement of this business there has been such an alarm endeavoured to be kept up (with but little intermission) of the very heavy losses that we must sustain, at first on the outward cargo, and latterly on the returns, (the latter idea having been very much strengthened by the development of the disastrous state of Thomson's business,) that very many well-disposed persons have concluded that we must really be doing a very ruinous business, and that it must end in a very unpleasant way; we therefore have concluded that we would prefer winding up and closing our business rather earlier than we had intended, in order that the public may be convinced that we are not without the means to bring it to a satisfactory issue whenever we see fit, (as it has been urged that we are obliged to keep on in order to benefit by the credit on the duties, &c., &c.,) and remove such unpleasant surmises. By the Isabella, Phœnix, and probably some one from New York, we shall have opportunities of writing thee again, when, if any alteration in our views takes place, we will communicate them.      Thine truly,

I. C. Jones, Oakford & Co.,
Samuel Archer."

*Extract of letter dated Philadelphia, October 5, 1826, from I. C. Jones, Oakford & Co., and Samuel Archer, to Nathan Dunn.*

"Within the last month there has arrived from Canton, the Citizen and Splendid at New York; and at this place, the B. Rush, T. Scattergood, and last of all the Phœnix, which arrived on the 27th ultimo, all well, but as heretofore to a dull market. Thee will see by the report of sales both here and in New York, as noticed in the shipping list, that the tea market is very low indeed, and there appears to be but little prospect of improvement during this fall."

*Extract of letter from I. C. Jones, Oakford & Co., and Samuel Archer, to N. Dunn, dated Philadelphia, October 7, 1826.*

"The letter we wrote thee under date of 7th mo. 18th last, we forwarded open with others to S. T. Jones, to be sent by the Isabella, and it drew from him the observations that are contained in the copy of letter from him to us, dated 9th mo. 24th, and sent herewith. The determination we came to at that time was with

[Archer v. Dunn.]

reluctance; but we thought it due to thee to have some decision on the subject, and the miserable state of this market for returns has continued to be very discouraging all the season; we have, however, no doubt but the withdrawal of Thomson's business, and the reduction of T. H. Smith's, will be very sensibly felt both in your market and ours, and that the consequence will be much lower prices with you, and better sales here; this certainly will make it desirable for us, after wading through such a determined opposition and competition as we have met with, to participate in some degree in the benefit of their withdrawal; and as we fully agree with S. T. Jones that it will be almost if not impracticable for thee to leave Canton in the Isabella, which vessel we may reasonably conclude will leave there in the 4th or beginning of the 5th mo., and as the regular season will then be over, and it is not likely that thee will be ready, or meet with a suitable opportunity, before the return of the vessels that may leave here next spring, we have therefore changed our views, so far as to request thee to not leave Canton before the receipt of letters from us by the early spring vessels, which will give us an opportunity of seeing the result of the closing sales of the different cargoes this fall, and how the prospect looks for next year.    And should we see an inducement, we shall prefer thy remaining to the end of the time stipulated, and we trust it will be no disadvantage to thee to comply with our request, for, as stated above, we do not expect thee will be able to leave before that time; but as it is a matter of great importance if we should do any thing to have thee there, we write this to make it certain.    Should thee think we are vacillating in our views, our apology must be in the peculiar state of the times.

We confirm what we wrote under date of 5th mo. relative to bills of exchange.    We send thee herewith a marked catalogue of the sale of two-thirds of the Phœnix's cargo, by which thee will see the miserable state of this market for teas.    The B. Rush's and T. Scattergood's cargoes remain entire, as well as a number of other heavy lots, say a large proportion of the Superior, Globe, Dorothea, Addison, and Woodrop-Sims's cargoes."

---

"*Canton, November 24th,* 1826.

" Samuel Archer, and I. C. Jones, Oakford & Co.

" Esteemed friends,—In regard to the withdrawal of Whitton Evans, the pressure of hard times at home, and the paralyzed condition of the concern—after giving the whole matter (as I trust) its due consideration—it is natural for me, whilst I lament the difficulty on your part, to estimate my own interest, which is so materially affected by this sudden derangement of our prospects; in so doing, I have to notice a seeming disposition on your part to

[Archer v. Dunn.]

disown any positive engagement to me that should necessarily influence your decision respecting the Canton business, which puts me under the necessity of reminding you, that the article which you hesitate to ratify is an unimportant paper.

Yours of 4th mo. 15th, 1825, over your three respective signatures, contained your serious proposals and conditions for my further continuance at Canton for an additional term of two years; to the terms of that letter I acceded, which was ratified by mine of 11th mo. 19th last, in which I positively accepted of the latter of the two offers which yours contained. The article which accompanied it was to afford you an opportunity (if so disposed, after hearing my remarks,) to fill the commission blank according to my views.  With due regard,

NATHAN DUNN."

---

*Extract of letter, dated Philadelphia, December 12th, 1826, from I. C. Jones, Oakford & Co., and Samuel Archer, to Nathan Dunn.*

" We avail ourselves of the detention of the Augusta, to inform thee that we have now arranged for a vessel (the William Brown or the Woodrop-Sims) to sail from England about the 1st of 6th mo. next, with a cargo in dry goods of not less than about £50,000 sterling, to be increased or not, as circumstances between this and that time may seem to warrant."

---

*Extract of letter, dated Philadelphia, February 12th, 1827, from I. C. Jones, Oakford & Co., to Nathan Dunn.*

" We wrote thee on the 10th inst., and sent the letter to New York, to be forwarded by T. H. Smith, per this conveyance. In that letter, we mentioned our expectations of sending a ship direct in the course of 60 days from this time; since then, upon a particular investigation of the documents sent by thee from time to time, relative to the exports to this country, we have very much determined to send one."

---

*Extract of letter, dated Philadelphia, February 16th, 1827, from Samuel Archer and I. C. Jones, Oakford & Co., to Nathan Dunn.*

" We wrote thee on the 10th, and under cover to J. Jenkins on the 12th inst., both sent to New York, to be forwarded by this conveyance; we also directed the New York price-current to be sent. We now fully confirm what we then wrote, and may add that we are in treaty for a vessel of pretty large tonnage, and if we agree for her, which is quite probable, she will leave here early in the 4th month, with about $200,000."

[Archer v. Dunn.]

"*Canton, March 12th*, 1827.

"SAMUEL ARCHER AND I. C. JONES, OAKFORD & Co.

Respected friends,—Your duplicate letter of the 10th mo. 7th last, per Citizen, came to hand the 3d instant, and that of the 7th mo. 18th, in its due course; their contents have been considered, but I deem any remarks on them superfluous: on my own part, suffice to say, that so far as I am capable of judging, it appears to me that it will be necessary for me to remain here until the 7th mo. 13th, 1828, to fulfil my part of the stipulation existing between us.                 Believe me, with due respect,

NATHAN DUNN."

*Extract of letter, dated Philadelphia, March 24th*, 1827, *from I. C. Jones, Oakford & Co., and Samuel Archer, to Nathan Dunn.*

"Our last was under date of 2d mo. 10th a 16th, per Beaver, from New York, copies of which we hand herewith. In the last of those, we mentioned our intention of sending an early spring ship, and we accordingly soon after chartered the Newport, and now send her out with $204,460 in specie, and merchandise as per invoice."

*Letter to Nathan Dunn, from I. C. Jones, Oakford & Co., and Samuel Archer, dated Philadelphia, March 24th,* 1827.

"ESTEEMED FRIEND, NATHAN DUNN,—

Inclosed we hand thee invoice and bills of lading for property shipped on board the ship Newport, Burroughs master, bound for Canton, and consigned to thy address, amounting to $204,460, there being $136,000 in specie, and in merchandise $64,649.02. Having borrowed of Comly & Tevis $90,000 on this shipment, we have agreed to consign to them, as collateral security for the loan, the sum of $112,000. We therefore request that on the homeward voyage thee will make out and consign to *order* an invoice on account of each of our houses, amounting to $56,000, and inclose it under cover with bill of lading, *also to order (and endorsed in blank) to Comly & Tevis;* the balance of the cargo thee will of course consign to us in the usual way, and in the manifest the whole will appear consigned to us.

Thine truly,

I. C. JONES, OAKFORD & Co.,
SAMUEL ARCHER."

"*Philadelphia, April 6th,* 1827.

"NATHAN DUNN.

Respected friend,—In reply to thy letter, under date of the 11th mo. 24th, 1826, we may observe that we entirely agree in

the sentiment, that a contract verbally entered into should be equally binding as though it was sanctioned by the strongest and most solemn instrument, signed and sealed by the contracting parties; and perhaps it will not be going too far in saying this is not only our opinion, but have endeavoured to make it our practice so far through life; and when writing the gloomy letter to which thee refers, we were quite sensible of the nature and obligations of the arrangements between us, and had no disposition at the time to shrink therefrom; but with the aspect of the commercial world at that moment, and the prospect of heavy losses on the return cargoes, thought it safer to subject ourselves to any demand thee could properly make upon us for any delinquency that might occur on our part, rather than jeopardize a much larger amount, by continuing with prospect of heavy losses. We therefore cannot help thinking that some of thy remarks were rather premature, as the result must prove; at same time do not complain that thee should be alive to thy interest, without waiting the expiration of the time agreed on.

As we had informed thee previous to receipt of the letter above alluded to, it will be seen that we were proceeding to the accomplishment of our engagements; and trust when thee has closed the business of the three ships to leave for Canton this year, no cause will remain for complaint, at least against us; but should we be mistaken, shall hold ourselves bound to fulfil to the uttermost of our engagements.

As heretofore thy assured friends,
(Signed)       SAMUEL ARCHER,
I. C. JONES, OAKFORD & Co."

---

"*Philadelphia, April* 14*th,* 1827.

"ESTEEMED FRIEND, NATHAN DUNN,

We wrote thee under date of 9th inst., per Splendid, advising of the safe arrival of the Tobacco Plant, since which we have made extensive and satisfactory sales of silk goods received by her. We now have the satisfaction of advising of the safe arrival of the Superior, with her passengers all well; S. W. Archer and M. Loyd having reached this city. The Caledonia has also arrived. A few days since, we received a letter from our S. T. Jones, announcing his safe arrival in England, a copy of which we inclose.

Although thee may suppose we are rather whimsical in our views, yet as we have reason to believe, notwithstanding the gloomy prospect with which our second term of agreement commenced, and the withdrawal of one of our late concern from the business, thee will not have much cause of complaint by the time the two years expire. We are emboldened to make thee a proposal to remain as our agent for a further term of    years, from

the 7th mo. 13th, 1828; and should it be agreeable to thee to remain, we will engage to make consignments to thy address to an amount that will insure thy commissions to amount to $25,000 per annum at least—the per centage to be $2\frac{1}{2}$ for sales of outward cargo, and $2\frac{1}{2}$ per cent. for investing proceeds thereof, and 3 per cent. for investing specie, and that all our shipments to Canton shall be consigned to thee.

The other parts of the agreement same as heretofore, as relates to thy privileges and exclusive services, viz.:

Nathan Dunn engages to use his best exertions in disposing of the outward cargoes received from us, and investing the proceeds for the return cargoes for our interest.

Nathan Dunn is not to interfere with our interest in soliciting or receiving consignments from any other concern (excepting a mutual arrangement with some respectable resident at Canton, to act in case of demise), or in importing dry goods from England.

We agree to allow Nathan Dunn, in lieu of factory rent, provisions, servants, cumshaws to linguists, and house compradore, if two ships arrive within each year, $1667 on each ship; if three or more within the year, $550 to be charged on each such additional ships; if but one ship arrives at Canton within the year, $3334 is to be charged in lieu of factory rent, &c., as above specified, on said ships; and if none should arrive within the year, then we agree to pay Nathan Dunn $3334 in Canton, in lieu thereof.

We agree to allow Nathan Dunn fifteen tons of forty cubic feet privilege each, in two ships, in each year, from Canton to the United States; and for stores, specie, and merchandise (other than dry goods), not exceeding thirty-five tons, and in two ships annually from the United States *via* England to Canton free of freight.

Any storage or other expenses on the outward cargoes at Canton, or on goods purchased in anticipation of arrivals, to be charged to us.

And we are willing to state distinctly that, upon being advised of thy acceptance of this proposition, we bind ourselves to the fulfilment of it by the payment of the above sum annually, although from unforeseen events we should not ship the amount that would produce this sum; but from our views and feelings we flatter ourselves that our shipments will be to an extent that will yield thee considerably more.

Thy reply to this communication by the first and different opportunities to the United States will be very desirable, in order if thee accepts our proposition, we may have time to prepare our operations for next season; and upon receipt of such a letter we will consider the contract as complete.

We have left the time of thy remaining in Canton blank, to

[Archer v. Dunn.]

be filled up by thyself either two or three years, as may best suit thy own views.

With sentiments of much regard, we are thy friends,

(Signed)                I. C. Jones, Oakford & Co.
                        Samuel Archer."

---

*Extract of letter, dated Philadelphia, June 8th 1827, from I. C. Jones, Oakford & Co. and Samuel Archer, to Nathan Dunn.*

"Our arrangements will be made for the Globe to leave Liverpool on or about the 1st of 10 mo. next, and we have directed S. T. Jones to prepare from 50 to £60,000 sterling, depending upon the state of the market and the amount shipped; and we think it quite probable he will make it the latter sum."

---

"*Philadelphia, September 28th, 1827.*

"Esteemed friend, Nathan Dunn,

We have this day written thee advising of the arrival below of the Isabella, and acknowledging receipt of thy several favours up to No. 16, inclusive. Notwithstanding there has not been time for us to receive an answer to our communication made to thee in the 4th mo. last, relative to a continuance in Canton as our agent, yet from the remarks in thy letters now received, particularly No. 12, which inclosed a letter for S. T. Jones, we infer that thee was inclined to remain a further period, and, from the liberal terms offered by us, we cannot but suppose they would be accepted. We have concluded to forward thy letter to S. T. Jones, and to request him to prepare a cargo to be ready to leave Liverpool from the middle of the 5th month to the 1st of 6th month next, to the amount of about £60,000 sterling, to be assorted agreeably to thy instructions. We shall therefore rely upon thy remaining to take charge of and dispose of this cargo, whether our proposition is accepted or not; and if it is accepted, we shall go on to fulfil our part of it. Thee will be aware that if we had waited for thy reply it would have hurried us very much to send two cargoes next year, and would have made them very late. As thee will have this early information of our views, thee can make thy arrangements for the disposal of the outward and the purchase of a return cargo in anticipation of the arrival of the vessel, so as to make her return as a spring ship. As S. T. Jones will have plenty of time, and has now had much experience, we have no doubt but he will select a very handsome cargo. Thine truly,

                        I. C. Jones, Oakford & Co.
                        Samuel Archer."

(Received by defendant February 14th, 1828.)

[Archer v. Dunn.]

" *Canton, October 1st,* 1827.

" SAMUEL ARCHER AND I. C. JONES, OAKFORD & Co.

Respected friends,—I have duly received your favour of the 4th mo. 14th last, containing a proposition to me to remain for a further term of two or three years in this country as your agent, upon conditions set forth therein; which, on mature reflection, I agree to accept for two years, to commence on the 7th mo. 13th, 1828, and end on the same day in 1830.

Very respectfully,<br>NATHAN DUNN."

---

*Letter to I. C. Jones, Oakford & Co., and Samuel Archer, from Nathan Dunn, dated Canton, October 5th,* 1827.

" I. C. JONES, OAKFORD & Co., AND SAMUEL ARCHER.

Respected friends,—By the assistance of my Chinese friends, I have succeeded in despatching the Newport with a full cargo, but a recurrence of the same assistance cannot again be calculated on; the object of this letter is to call your attention to what appears to me to be the prominent defects in the course you have adopted in sending a ship direct from the United States this season: they are, first, that you were too late in making up your minds; 2d, the funds were too light; and 3d, that the ship carries too much by 300 tons or more. In the regular season, you advise of your intention to send the Newport with about $200,000 in specie and cargo, with an order for the investment that would fill about 630 tons, and amount to $229,500; the teas that you have estimated to cost $103,500, agreeably to my calculation will amount to $143,000; to fill a ship of the size of the Newport with the usual assortment of teas, at the customary prices, requires, as you will see by the inclosed sketch, $221,000, and with your arrangements, the order for silks and nankeens would be superfluous for the want of means to purchase them. Silks, adapted to the sales in the United States, are generally the article that pays the best advance; the advantage that a resident has over the transient ship, provided he has the means and qualifications to avail himself of them, are such as in most cases to yield a fair advance, while others could only obtain first cost; there are but few seasons pass but what, from the 1st to the 7th month, silks can be obtained on favourable terms. I will not insist on these advantages any further: they have been pointed out to you years since, and if you do not avail yourselves of them, I believe I shall be clear. It may, however, be proper, previous to closing this address, (as it will probably be the last on the subject of direct ships), to state what would be the most eligible course, in my opinion, for you to pursue, if you should wish to avail yourselves of the advantages of your situation, which would be, that you

[Archer v. Dunn.]

make up your mind that *you will send* one direct ship every year, with at least $300,000 in specie, or a proportion of it in Bank United States bills on England; that the ship shall sail from the United States by the 1st of the 4th month; that she be about the size of the Tobacco Plant, or not to exceed in her carrying 500 tons; that she have a *fast captain.* And I would say that I would be prepared with a homeward cargo, and that she should sail on or about the 1st of the 10th month from Canton, so as to insure her to be with you in time to dispose of her cargo previous to the arrival of the regular season ships. It is important that the ship should leave you at the time mentioned, so that if early contracts were made for her silks, &c., the Chinese should know about the time they could be reimbursed; the less cargo the better. *Ginseng* should be omitted.

Believe me very sincerely,

NATHAN DUNN."

---

" *Canton, December* 25*th*, 1827.

" SAMUEL ARCHER AND I. C. JONES, OAKFORD & Co.

Respected friends,—Two invoices for part of the returns of the Woodrop-Sims's cargo on your account, are, agreeably to your directions, filled up to order with my blank endorsement, and forwarded under cover to John A. Brown & Co. The purport of this is to say, that such endorsements constitute the shipper the consignee, and of course make him liable for the duties accruing to the government: in expressing my opinion that I do not believe that I incur any danger by such a responsibility with you, I should also state that in my situation I believe it is not usual to incur them. In requesting you to adopt another mode, I take the liberty of inclosing a form of an endorsement as attorney; if it answers your purpose, you will please take the written opinion of two eminent attorneys on the liability attached to it, which I should like to see.

Believe me very respectfully,

1st Woodrop-Sims. ⎱　　　　　　　NATHAN DUNN."
2d Caledonia.　⎰

---

" *Canton, February* 1*st*, 1828.

"SAMUEL ARCHER AND I. C. JONES, OAKFORD & Co.

Respected friends,—By a reference to your respective accounts, which I now have the pleasure of inclosing, you will perceive that the balances together in my favour at this date is $81,295.21; to which is to be added the outstanding debts, due me on your account, of $72,280.33: amounting, as per statement also inclosed, to $153,575.54.

II. — 45　　　　　2 E *

[Archer v. Dunn.]

The interest account herewith you will perceive is calculated, according to the usage of Canton, at one per cent. per month. The principle upon which it is stated, is preferred on account of its simplicity, and accuracy in regard to dates. It embraces all receipts and payments of money on your joint account, and the average balance of cash in the treasury, which is taken from a cash-book, correctly kept and regularly balanced: the other sums on which interest is reckoned (except on the balance of former accounts) are commissions due me, as your account-current will show; the dates to these sums, when arising from sales, are taken at their average due. In regard to the interest on the balance in my favour, 10th mo. 21st, 1826, when your accounts were rendered, the correctness of that sum will be shown by a statement also herewith for that purpose; which balance is also deemed to have existed at the close of the former concern on the 7th mo. 12th, 1826. My books were not balanced until the 10th mo. 21st, aforesaid; but as no transactions intervened between those dates materially to affect the balance, I conclude it was due on the 7th mo. 12th, and have charged interest accordingly, as you will perceive.

Respecting the charge of interest upon the average balance of cash on hand, you will find that I have credited you by interest on all money from the dates of its receipt, and charged interest from the dates of payment, which will explain the necessity of this charge. The nature and magnitude of my operations on your account will also convince you that such a balance is unavoidable.

In charging commissions on the sales of dry goods and for the investment of the same, I have followed literally your letter on that subject of the 4th mo. 15th, 1825, which would not have required to be noticed here, but for my misconstruction of it when I formerly wrote you on the subject.

Believe me, very sincerely,

NATHAN DUNN."

---

*Extract of letter to Nathan Dunn, from I. C. Jones, Oakford &*
*Co., and Samuel Archer, dated Philadelphia, July 7th, 1828.*

"We have almost concluded on sending a small ship this coming fall to Canton *via* Liverpool; shall determine in a few days. S. T. Jones informs us Perkins & Co. are doing but little, and the company not so much as usual, and encourages us to believe a fall vessel may do well. Should we send another vessel she will not leave until late in the fall; will then leave two more vessels to be sent the next season."

[Archer v. Dunn.]

*Extract of letter to Nathan Dunn, from I. C. Jones, Oakford &*
*Co., and Samuel Archer, dated Philadelphia, August 26th, 1828.*

" We have lately chartered the Tobacco Plant, which is expect-
ed to leave Liverpool for Canton in all the 11th month, with about
£45,000 of such cargo as may be most likely to answer best."

---

*Philadelphia, October 21st, 1828.*

" NATHAN DUNN.

Respected friend,— The Alert being detained affords us an
opportunity of advising of the arrival of the Globe on the 11th
instant, all well. Her cargo is not yet landed, but think it will
pay cost and charges. Young hyson teas are better; the raw
silk we think will bring $4.50 per lb. short price; some of the
piece silks have been sold to a good profit; the black sarsnets,
cost $5.25, sold at $11.00; white sarsnets sold by I. C. J., O. &
Co. at $17.00; rhubarb 75 cents. We think the worst has passed
as to Canton operations, but it is with feelings not to be described,
that we must say to thee our situation is such at present, that we
cannot calculate on any benefit hereafter to arise from our own
means or credit, having arrived at the foot of a mountain which
we have no hope to pass, or at least not until we have encamped
in the valley for some time to regain strength.

On arrival of the Globe, we were refused permission of enter-
ing her cargo unless additional security was given; this was offer-
ed, but refused as not competent; it resulted in J. A. B. & Co.
joining us in bonds, and taking possession of the property; this
circumstance, added to the loss we sustained by Whitton Evans,
completely closed the little credit we had; and seeing no prospect
of being able to borrow hereafter from either banks or insurance
companies, have, with the most painful reluctance, decided on com-
ing to a stand for the present. We need scarcely say to thee how
great the mortification is to us; after an extensive business for thirty-
four years by S. A. and thirty-seven years by I. C. J. to be brought
to such a dilemma, and that, too, just at a time the most certain
to do well by the Canton trade, which hitherto has proved so dis-
astrous on returns; and having outlived most of those engaged
in the trade, had the custom-house permitted us to enter as here-
tofore, we should have hoped to have pressed through our difficul-
ties. The duties on the Globe would have given us $170,000; J.
A. Brown & Co. would have taken our notes for $100,000 more;
this they offered if we could enter without their aid. But so it
is, and we are to follow the sad example of a great portion of the
merchants of our country.

But amidst this thick darkness a bright spark is seen; J. A. B.
& Co. will send the Tobacco Plant this fall as previously intended,
for our benefit, furnish all the needful, and if the prospect is fair
on arrival of the Isabella, she will depart on same conditions, and

[Archer v. Dunn.]

be continued so long as it will benefit us. Our loss by W. Evans is about $235,000, and various other losses not much short of this amount, which have befallen us within the last twelve months; such heavy losses perhaps has scarcely ever befallen the lot of men in the same space of time, and yet we still hope ere long to pay all demands against us, but at this time cannot do so; and to accomplish so desirable an object, we have to ask whether it will comport with thy views and inclination to remain a further period in Canton; on this point we should like to hear from thee as early as possible. Should thee determine to remain, please say how long, and the terms, as we shall, in our present situation, leave both these points pretty much to thyself, believing as we do, that no extravagant rate would be demanded. Our friends propose sending two vessels in each year, so long as the business is found to answer; the funds probably about as formerly.

Any funds thee may send forward hereafter, belonging to us, please ship for account and risk of J. A. Brown & Co., and to them consigned. We have had many and very heavy losses since embarking in the Canton trade, independent of losses on returns; this part of our loss would have been covered by the handsome operations on the outward cargoes.

The prospect is certainly now fair for at least cost on returns; if this be realized, a few voyages *via* England we can but hope will compensate for the past in a great measure.

We have already paid for account of W. Evans, since his stoppage, about $90,000 in cash, and not received one cent from him, with the exception of $3000 or $3500 in debentures, which he could not make any use of but in payment of bonds.

Hoping to hear favourably from thee in regard to thy further stay at Canton,

We remain, with respect and esteem,
SAMUEL ARCHER,
I. C. JONES, OAKFORD & Co."

---

" *Canton, March* 17, 1829.

" SAMUEL ARCHER AND I. C. JONES, OAKFORD & Co.

Esteemed friends,—In reference to your request that I would remain for a further period in this country as your agent, as per your favour of the 10th mo. 21st last, I understand it of course to mean from and after the 7th mo. 13th, 1830, as I am already under an engagement with you until that time; and that I now proceed to state, that upon reflecting on this proposition I have come to the following conclusion: That if agreeable to you I will remain here for a further term of one year, commencing on the 7th mo. 13th, 1830, and ending on the same day in 1831, on the following conditions: that you engage to allow me a commission of five per cent. on the sales of dry goods received by way of England, and

[Archer v. Dunn.]

for the investment thereof; and three per cent. on specie, and three per cent. on the sales of all other cargo than dry goods from England, and three per cent. for investing the same. And that all shipments to this country in which you have any interest shall be consigned to me, and that you engage that my commissions shall amount to $25,000 in the year, payable here. That you allow me a privilege of 30 tons freight (of 40 cubic feet) from this to the United States free of charge, and from the United States to China via England a privilege for stores, specie, and merchandise (other than dry goods) of 35 tons each in two ships free of charge. That storage and other expenses arising on either the inward or outward cargo be charged to you. And that you allow me in lieu of factory rent, provisions, servants, and linguist's fees, if two ships arrive within the year, $1667 for each ship; if but one within the year, $3334; and if more than two ships within the year, for such additional ships a further allowance be made of $550 each; but if no ship arrives within the year, I am to be allowed the $3334 in lieu of factory rent, &c., as above stated.

And that I remain in this country for the disposal of the property, and the investment thereof, as may appear most for your interest; and that I do not interfere with you by the importation of dry goods by way of England.

If you should feel a reluctance to the engagement of making up my commissions to $25,000 in case they should not equal that amount on the sales, I am willing in lieu thereof to make another offer, and which I will call the second proposition.

That you engage to allow me a commission of six per cent. on the sales of dry goods by way of England, and for the investment thereof; and three per cent. on specie, and three per cent. on sales of all other cargo than dry goods from England, and three per cent. for investing the same; and that you engage that all shipments to this country in which you have any interest should be consigned to me; that the other parts of this second proposition be the same as the preceding, as detailed above.

On being informed of which of these terms you accept, I shall remain in this country for the fulfilment of my part thereof; and have to request that you will please to inform me by the earliest conveyance.

　　　　Believe me, with much respect, your friend,
　　　　　　　　　　　　　　　NATHAN DUNN."

1st per Pacific, ⎫
2d brig Leander. ⎭

---

*Extract of letter to Nathan Dunn, from I. C. Jones, Oakford & Co., and Samuel Archer, dated Philadelphia, May 31st, 1830.*

"We had hoped that the extent of commissions on our business had been so great that in any new arrangement we should have

[Archer v. Dunn.]

been able to have them reduced to two per cent. on sales and two for investments; this would amount to a large sum yearly; this you can take into consideration, and if you think well of adopting it we shall be pleased, if not we prefer as the fairest mode that you charge $2\frac{1}{2}$ per cent. on sales and $2\frac{1}{2}$ per cent. on the investment, the latter may be added at the foot of the invoices. Can you not also reduce the sum charged for factory rent, &c., below $1667 each ship; this is considered the highest rate paid for single ships."

*Extract of letter to Nathan Dunn, from I. C. Jones, Oakford & Co., and Samuel Archer, dated Philadelphia, May 7th, 1831.*

"If it was to the extent contemplated, say sterling £100,000—the *gross* sales of which would probably be nearly or quite $700,000—and yielding a commission of nearly $35,000. This from one concern we think no trifling compensation. But to come to the point, it is our *intention and expectation* to continue to have forwarded, through the means of our friends, as many goods as you can vend advantageously."

"*Philadelphia, December 24th, 1831.*
"Respected friend, Nathan Dunn.

Having now gone through an examination of thy accounts, and discovered what we consider sundry errors, amounting in the aggregate to the sum of $19,763.77, exclusive of interest, the particulars of which thee will observe per the inclosed accounts; be so obliging as to examine the different items and inform us thy opinion of the result.
                    Very respectfully thy friends,
                              I. C. Jones, Oakford & Co."

*Letter to I. C. Jones, Oakford & Co., and Samuel Archer, from Nathan Dunn, dated Philadelphia, February 17th, 1832.*

"Respected friends,—I regret having delayed so long to reply to your note of the 12th mo. 20th last, inclosing two statements of alleged overcharges in my accounts, the first for $2872.19, growing out of the difference between 5 per cent. on sales and for investing the same, and $2\frac{1}{2}$ per cent. on sales and $2\frac{1}{2}$ per cent. on investments.

The charges in my account are predicated on an arrangement between us for merchandise that should leave England to my consignment between the 7th mo. 13th, 1826, and the 7th mo. 13th, 1828, as per your letter of the 4th mo. 15th, 1825, in which are

[Archer v. Dunn.]

these words, ' will allow 5 per cent. commissions on sales of merchandise and for investing nett proceeds of same,' which appeared to me comprehensive, admitting of but one construction; and since the subject has been again called to my attention, by the receipt of your statement, I cannot see how the commission can be divided and $2\frac{1}{2}$ per cent. charged on the investment, as you seem to wish it, when this letter states that 5 per cent. is to be charged on sales, as the compensation for making them and investing the proceeds.

The Isabella's fourth cargo being purchased early in 1828, comes under the arrangement for these two years, and for the two succeeding years, the two cargoes in the ships Tobacco Plant and Isabella were forwarded.

Believe me, very respectfully,<br>N. DUNN."

---

"*Philadelphia, October 29th,* 1838.

" FRIEND NATHAN DUNN.

My father being too unwell to write, has requested me to say, that on the evening of the 20th inst. he was handed two papers from thee, dated 5th mo. 31st, 1836, with some remarks, and purporting to be an account between thyself and him, showing a very large balance in thy favour. My father considers said statement so extraordinary a one, that he cannot receive it as a true account between you. Respectfully,

(Signed)  SAM'L W. ARCHER,<br>For SAMUEL ARCHER."

---

The case was argued by *J. R. Ingersoll* and *J. Sergeant* for the defendant, and *Price* and *Meredith* for the plaintiffs.

The opinion of the Court was delivered by

GIBSON, C. J.—To judge of the objection to the form of the action, it is necessary to consider how the parties stood at first, and how they stand now. By the original contract between Samuel Archer, Whitton Evans, and the partner firm of I. C. Jones, Oakford & Co., they agreed with the defendant and with each other, to enter into the Chinese trade for a period of not less than three nor more than five years; the first named parties furnishing capital to send two ships yearly to Canton by way of England, and the defendant furnishing his services in selling the goods at Canton, and investing the proceeds in return cargoes separately consigned, in proportion to their respective shares, to the parties resident in Philadelphia. It was agreed that the defendant should not bear a part of any loss on dry goods, but that he should share, equally with the others, the profits arising from a sale of them, and have a commission on specie as well as on the other parts of

each cargo. His profits and commissions were to be taken out at Canton and shipped on his separate account in one of the company's vessels; and the funds of the other parties were to be invested for each of them, on separate account, in Chinese goods, separately invoiced, and consigned to them in proportion to their shares without regard to the state of the partnership accounts. It is plain from this, that there were two special and distinct partnerships; the one between all the parties to the contract as regards the dry goods, and the other betwixt the parties of the first part as regards the rest of the cargoes, the defendant being, in regard to the latter, no more than a factor; and it is plain also, that joint ownership of the funds was to cease as soon as they were invested in return cargoes on separate account. This arrangement continued in force during the contemplated period of five years, and was succeeded by another between the defendant on the one hand, giving him a commission on dry goods instead of profits, and Samuel Archer and Jones, Oakford & Co. on the other, Whitton Evans having retired. By this the defendant ceased to be a partner; and it was in turn succeeded by yet another on the same terms, except that the concern gave a guaranty that the commissions should not fall short of $25,000 the year. The money for which this action is brought is the proceeds of sales made in the second and third periods.

On these facts, it is clear that several actions could not be maintained on the special contract, as it was made with the plaintiffs jointly. In *Vaux* v. *Steward*, (*Styles* 156), and *Vaux* v. *Draper*, (*id.* 203), a joint action was maintained on a promise to two in consideration of £10 paid to procure the restoration of their cattle which had been distrained, because the consideration had moved from the plaintiffs jointly. Here the consideration—the employment of the defendant by the plaintiffs as their factor—certainly moved from them jointly. What matters it, then, that the proceeds were to be divided at Canton, and the share of each partner separately consigned to him without waiting for a settlement of the parnership accounts? That arrangement was a matter betwixt the partners themselves, and for their private convenience. Partners are tenants in common of the partnership effects; and their interests continue to be blended till they are separated by actual partition. But it is argued that the present action is brought on an implied promise which is joint or several, as the consideration is joint or several; and so the law was held in *Boggs* v. *Curtin*, (10 *Serg. & Rawle* 211); but the consideration, moving as it did from the plaintiffs as partners, was joint, and the resulting promise is consequently joint. The money in the defendant's hands was received by him as the price of the partnership effects; and being partnership funds when it was received, it remained so, being undivided by separate investment. There are cases in which an action may be brought jointly, though the interests to

be recovered depend not even on a joint consideration; as in *Coryton* v. *Lethbye,* (2 *Saund.* 115), in which several owners of mills, at the one or the other of which the defendant was bound to grind his barley and wheat, were allowed to join in an action for grinding at another mill, because damages might be twice recovered if they were allowed to bring several actions. Would not the defendant in this instance have been equally vexed by a multiplicity of suits? Independently of policy, however, this action is maintainable on principle. The effects were joint when they were sold; they were sold on joint account; and the price was joint when it was received. It ought to have been parted and invested, but it was not. Being recoverable from the buyer only on partnership account, it was received by the defendant on partnership account; and it could consequently be recovered from him only as so much received to the use of the concern. Had the defendant separated and invested one of the shares, a curious question might have arisen as to joinder in an action for the other. The partner entitled to it might perhaps have maintained a several action for it; but had more than one been entitled, perhaps all would have been bound to join.

The action is therefore well brought; and this determination of the point is decisive also of the question of set-off betwixt the defendant and the personal representatives of the deceased partner. Defendants may undoubtedly set-off the cross demand of one of them, and thus, with the assent of all, pay their joint debt with his several property, for, as was held in *Stewart* v. *Coulter,* (12 *Serg. & Rawle* 252), no one can be hurt by it; but there is no instance of a set-off of a debt due by one of several plaintiffs, because that would enable the defendant to pay his debt to the prejudice of the others. The point is too clear for elucidation; and it was, besides, directly decided by this court in *Henderson* v. *Lewis,* (9 *Serg. & Rawle* 379).

The question of commission depends on the interpretation to be put on the contract of the parties, collected from their letters and acts; for the memorandum prepared by the defendant at Canton, was not executed by the plaintiffs. It has, however, been legitimately referred to for the defendant's understanding of the agreement; and it is enough to say that it is as obscure and uncertain in its terms, as mercantile contracts usually are. Blanks were left in it for the rate of commissions, to be filled by the plaintiffs; and in the letter which accompanied it, the defendant said; "I must leave for your decision to fill (the blanks) at either the five per cent. for the sales and investment of dry goods agreeably to your offer under the date of the 4th mo. 15th, 1825, or say two and a half per cent. *on* sales of dry goods, and two and a half *for* investing the proceeds, *which amounts to the same;* OR on my terms of three per cent. on the *gross* amount of sales of dry goods, and three per cent. for investing the nett proceeds." The plaintiffs

[Archer v. Dunn.]

did not fill the blanks at all, and the question rests on the interpretation of the first alternative.

The clause in the memorandum stands thus: " The first named parties agree to allow Nathan Dunn, for his services, the following commissions, to wit, —— per cent. on the —— amount sales of dry goods, and —— per cent. for the investing of the proceeds; and three per cent. on all specie shipped, and three per cent. on sales, and three per cent. for the investment of all other cargo, and three per cent. on the ships' and factory disbursements, to be received in Canton." This makes the matter no clearer than the proposition in his letter. In both he asked three per cent. on the gross amount of sales ; and if he demanded that as the basis of the larger commission, it would be singular if he had consented to take any other for the smaller one. Yet if he meant to insist on the gross amount for each, it is singular that he did not say so in regard to both. But it is clear that the sum on which the commission was to be charged, was the amount of sales, whether gross or nett, and not the amount of the investments ; otherwise two and a half on sales, and the same on the investments, would not " amount to the same" as five per cent. on either. The same amount could be obtained only on the basis of an intermediate sum. In a subsequent part of the correspondence, the plaintiffs, after reciting the clause in the defendant's proposal already quoted, say: " Now thou will perceive that it is here left discretionary with us to pay either the five per cent. on the amount of sales, or to divide it as mentioned in thy letter, two and a half on the sales and two and a half on the nett proceeds. When we made the offer of five per cent., we were of opinion with thyself that it amounted to the same, *or nearly so*, say the amount of investments being less than the sales by the amount of thy commissions." The inference is, that they thought the difference too small to be a ground of objection. To say two and a half per cent. *on* sales, and two and a half *for* investing, is not necessarily to say two and a half on the sum invested. The sentence is elliptical, and supplying the parts omitted, would stand thus: two and a half on the sales for selling, and two and a half on the sales for investing. By no other interpretation could the apportioned parts of the commission be made the same as five per cent. on the sales. It is clear, then, that they were to be charged on the same sum; but whether on the gross amount or nett proceeds of the sales, would be a difficult question were it not settled by the contemporaneous construction of the parties. In the last year of the second period, the defendant transmitted the accounts to that date, accompanied by a letter, in which he said : " In charging commissions on the sales of dry goods and for the investment of the same, I have followed literally your letter on the subject, of the 4th mo. 15th, 1825, which would not have been required to be noticed here but for my misconstruction of it when I formerly wrote you

[Archer v. Dunn.]

on the subject." Yet the commissions in those accounts were charged at five per cent. on the gross sales; and this passed without objection till he had returned to America. If this were a misconception on his part, they were bound to undeceive him by the first opportunity; and the same principle of charging was suffered to run through the succeeding contract. Still farther, when the terms of his compensation for the third period were under discussion, and when the plaintiffs demanded a reduction, they said: " We had hoped that the extent of commissions in our business had been so great that in any new arrangement we should have been able to have them reduced to two per cent. on sales and two per cent. for investments; this would amount to a large yearly sum; this you can take into consideration, and if you think well of adopting it, we shall be pleased; if not, we prefer as the fairest mode that you charge two and a half per cent. on sales, and two and a half per cent. on the investment." This last would produce no reduction, if the former contract allowed no more; and there is certainly a difference on sales, and a per-centage on the nett proceeds of sales. We, therefore, think the defendant is entitled to five per cent. on the gross amount.

As regards amount, however, the important question is, whether the Isabella's cargo belongs to the second or the third period of the business. Perhaps the plaintiffs were bound to send two ships yearly by way of England. The dry goods could be advantageously laid in only there; and the plaintiffs had engaged to send that number in the first agreement, which was the basis of those that followed. Subsequently to it they speak of allowing him certain privileges " in two ships annually from the United States, *via* England, to Canton;" and a commission of so much per cent. " on the sales of dry goods received from England." But in the happening of a certain contingency, they were not to send two or any other number. In the memorandum of agreement, sent to the plaintiffs for execution, it was provided thus: " It is understood that if the information received from Nathan Dunn, by the first named parties, of the state of the Canton market for dry goods, should be so unfavourable as to make it necessary to suspend their operations for a season to prevent loss, in such an event, their engagement to send two ships in each year *via* England to Canton, is not to be considered binding." Though this instrument was not formally executed, its conditions are to be taken for a part of the contract, because they were not rejected, and the parties went on with the business on the basis of them. Now, the defendant had, in three of his letters, given a very discouraging account of the state of the Canton market, and in a fourth he said: " I am *now* of opinion it will be pretty safe to forward two cargoes in each season to this country, unless the shipments by Americans or the East India company are more than usual, or there are depressions in the Canton market. If not in time to ship in sea-

[Archer v. Dunn.]

son, to be deferred to the regular season of the next year." This intimation was promptly responded to by an order to the agent in England to prepare a cargo which could not however be shipped for the spring season, and the vessel was consequently despatched as a fall ship. During the residue of the term, two other vessels were sent at regular intervals, and the whole contract was in this respect complied with. Had it been the plaintiffs' duty to send the Isabella under it, every interpretation consistent with the words ought to be made from the circumstances, favourable to an intention to do so ; but as they were at liberty to send her as they pleased, we are bound to give their expressions their plain and natural meaning. It is to be remarked, that they had written a letter requesting the defendant to remain at Canton for a third period, to which they had not received an answer ; and that, had they waited to hear from him, the lateness of the season would, in case of his acceptance, have caused them to lose a voyage. In these circumstances they say, "Notwithstanding there has not been time for us to receive an answer to our communication made to thee in the 4th month last, relative to a continuance in Canton as our agent, yet from the remarks in our letters now received, particularly No. 12, we infer that thee was inclined to remain a further period, and, from the liberal terms offered by us, we can not but suppose they would be accepted. We have concluded to forward thy letter to S. T. Jones, and request him to prepare a cargo, &c. We shall therefore rely on thy remaining to take charge and dispose of this cargo, whether our proposition is accepted or not ; and if it is accepted, we shall go on to fulfil our part of it. Thee will be aware that had we waited for thy reply, *it would have hurried us very much to send two cargoes next year,* and would have made them very late." Was not the cargo of the Isabella intended to be one of them ? It is evident that this ship was sent in anticipation of the defendant's acceptance ; and that, had he previously signified a rejection, she would not have been sent at all. Whether he was bound to remain a single day beyond the limit of the existing contract, enters not into the question ; it is sufficient for all the purposes of intention that the plaintiffs thought he was not. They threw themselves upon his generosity to stay and take charge of the cargo in any event ; and it is plain they intended to send this ship in part fulfilment of the expected contract, should it be assented to. The circumstance that she was charged to the second contract, in the accounts received by the plaintiffs, without exception by them, is not sufficient to overbear an inference so manifest.

The remaining question has regard to the interest ; and it is to be determined by the law of the place where the contract was to be executed. The rate allowed by it may always be expressly reserved, though it exceed the rate allowed by the law of the domicil, or the law of the forum ; and where no rate is stipulated,

[Archer v. Dunn.]

the parties are presumed to have contracted in reference to the law of the place of performance, whether it be statutory or customary. 3 *Burge's Confl. of Laws* 771; 2 *Story's Com.* 251. The law of the forum is never appealed to. What matters it then that the defendant resumed his domicil of origin shortly after the debt was contracted? In consequence of the severity of the rule in this particular instance, I have desired to find an authority to make it an exception; but I have found none. The contract was to be executed in China, and the measure of damages for the breach of it, is the customary rate of Chinese interest. The defendant invested the money at Canton on his own account, and made the profit on it which the plaintiffs ought to have made; and he must consequently pay the same interest that he would have paid, had he remained abroad.

Judgment for plaintiffs, the amount to be settled by the counsel.